# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS EARL EVANS,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>JAMES TILTON,<br><br>　　　　Respondent.<br>_____/ | CV F   07-00678 AWI DLB HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR DISCOVERY<br><br>[Docs. 1, 32] |

    Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

<u>RELEVANT HISTORY</u>

    On June 3, 2004, following a jury trial in the Fresno County Superior Court, Petitioner was convicted of attempted voluntary manslaughter (Cal. Pen. Code §§ 664, 192);[1] co-habitant abuse with great bodily injury (§§ 273.5, 12022.7, subd. (e)); and, misdemeanor assault (§ 240). Petitioner was found not guilty of dissuading a victim/witness by force or threat (§ 136.1, subd. (c)(1) - count 4) and the allegation that he personally used a knife during the abuse charge was found not true (§ 12022, subd. (b)(1). In a bifurcated trial, the court found that Petitioner suffered two prior convictions for serious or violent felonies (§§ 667, subds. (b)-(I), 1170.12, subds. (a)-(d). (I CT 204-209, 211, 359-364.)

    Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1

Appellate District. On November 18, 2005, the appellate court affirmed Petitioner's conviction and sentence. (Lodged Doc. No. 1.)

Petitioner filed a petition for review in the California Supreme Court, which was denied on February 1, 2006. (Lodged Docs. Nos. 2, 3.)

Petitioner filed the instant federal petition for writ of habeas corpus on May 4, 2007. Respondent filed an answer to the petition on May 5, 2008, and Petitioner filed a traverse on July 7, 2008. (Court Docs. 27, 33.)

## STATEMENT OF FACTS

Prosecution Evidence

In December of 2003, Marsha Evans, was Petitioner's ex-wife and the two of them were planning to remarry. (RT 184, 187.) Petitioner was planning to move into Evans' home with her two children from a prior relationship. (RT 184-187.) On the evening of December 30, 2003, Petitioner was at Evans' home with his cousin. (RT 188-189.) That evening, after taking a shower, Evans went to bed in her bedroom between 10:00 and 11:00 p.m. (RT 190-191.) Evans indicated that Petitioner did not seem upset at the time she went to bed, however, he and his cousin had been drinking. (RT 191-192.)

After Evans fell asleep, she was awakened when, for no apparent reason, Petitioner jumped on top of her and put tape on her mouth. (RT 192.) Evans was able to remove the tape and she asked Petitioner what was going on. (RT 193.) Petitioner told her that if she said anything he would hurt her and her children even more. (Id.) Petitioner then attempted to put more tape on her mouth and he taped her hands together. (Id.) Evans was attempting to scream for her son to help her. (Id.) Although Evans attempted to fight Petitioner off, she was not successful because he was too big.[2] (RT 195.)

After Petitioner taped Evans' wrists, he hit her twice in the head by her left temple with a closed fist. After the first hit, he wrapped the tape around Evans mouth and nose. (RT 204.) She passed out after the second hit. (RT 196-197.) The next thing she remembered was

---

[2] Evans indicated that she was approximately five feet two inches tall and weighed 160 pounds, whereas Petitioner was over six-feet tall and weighed approximately 230 pounds. (RT 195, 520.)

2

1 awakening in the hospital.  (RT 197.)

2       Evans' son, John Luke Glenn, testified that on the evening of December 30th, he went to
3 bed between 9:00 and 10:00 p.m.  (RT 258.)  He remembered there was a little bit of arguing
4 between his mother and Petitioner, but it was no big deal.  (RT 258.)  Between 1:00 and 3:00
5 a.m., he was awakened by his mother's screaming and calling his name.  (RT 260, 287.)  He went
6 to the front of her bedroom and heard her crying.  (RT 261.)  The door was locked so he kicked it
7 open and he saw his mom sitting on the bed crying and covered in blood.  (RT 262-266, 270.)
8 Her left eye was swollen and she had a cut on her eyebrow.  (RT 266.)  John did not see any
9 weapons, but his mother had tape around her neck and hands.  (RT 267.)  John called his
10 grandfather first, then made two calls to 911, requesting help for his mother.  (RT 271, 288, 301.)
11 Although John did not observe Petitioner in the bedroom, his mother told him that Petitioner hit
12 her.  (RT 267, 286.)

13       Officer Smith was the first person to respond to the residence after the 911 calls.  (RT
14 308.)  As she approached the residence in her vehicle, she observed Evans' son, John, running
15 around outside yelling for help.  (RT 309.)  Upon entering the residence, she observed Evans'
16 daughter sitting on the floor crying.  (Id.)  Smith followed John to the bedroom where she
17 observed Evans laying on the bed covered in blood.  (RT 310.)  It appeared that she was grasping
18 for air and was attempting to pull something out of her neck.  (Id.)  When Smith attempted to get
19 the tape off of Evans' neck, she saw a knife on the floor and grabbed it to cut off the tape.  (RT
20 311.)  The knife was covered in blood.  (Id.)  Smith indicated that the tape was wrapped around
21 Evans' neck so tightly she had a hard time getting her fingers between it to cut it off.  (RT 312.)
22 She believed that John had also attempted to cut off the tape.  (RT 313.)  Smith also saw tape on
23 her hands, mouth, and loosely around her ankles.  (RT 313.)  Evans had a cut approximately four
24 to six inches above her left eye.  (RT 318.)  Smith observed a roll of tape and pieces of crumped
25 tape on the floor of the bedroom. (RT 328.)  Smith summoned an ambulance.  (RT 321.)  She
26 attempted to ask Evans questions regarding the suspect, but due to her high level of pain and fact
27 that she had blacked out a couple times, she was not able to respond to the questioning.  (RT
28 322.)

1     John told Officer Smith that his stepfather, Petitioner, had injured his mother. (RT 324-
2  325.) He indicated that upon being awakened to his mother's screaming, he went to her bedroom
3  and kicked the door in. He then observed Petitioner on top of his mom on the bed with a knife in
4  his right hand. (RT 325-326.) When John entered the room, Petitioner got off of his mother,
5  grabbed his bag, and left. (RT 326.) John indicated that Petitioner may have gone to his sister's
6  residence on Kern Street where he usually went when the two had an argument. (Id.)

7     John was able to direct officers to Petitioner's sister's residence on Kern Street. (RT 359-
8  360.) Officer Fern confirmed that the DMV report listed the Kern Street address as Petitioner's
9  residence. (RT 361.) Several officers made contact with Petitioner's sister at the residence and
10 conducted a search, however, Petitioner was not there. (RT 361-362.)

11    Officer Twitty made contact with Evans at the hospital and was able to get her statement.
12 (RT 347.) Evans was laying on the bed in one of the trauma rooms and she had a three inch
13 laceration above her left eye, which was still bleeding a little bit and her eye was completed
14 swollen shut. (RT 348.) Evans indicated that Petitioner had assaulted her. (Id.) On that
15 evening, Evans indicated that the two started arguing around 10:00 p.m. (RT 352.) Evans
16 indicated that when they had gone to the store earlier that evening, Petitioner felt that another
17 male was flirting with her, and he was upset. (RT 353.) Evans indicated this may have been the
18 reason he was still upset. (RT 355.) Petitioner had attempted to take her clothing off, but was
19 not successful because she was kicking. (RT 349.) Petitioner attempted to tie her ankles up and
20 struck her in the face and head. (Id.) She further indicated that he wrapped the tape around her
21 neck three times trying to kill her. (Id.) Evans believed that she had blacked out two or three
22 times during the assault. (RT 350.) When Evans would scream during the assault, Petitioner
23 told her to be quiet or he would hurt her and her children, and that if she told anybody about the
24 incident after he left, he would come back and harm her and her children. (RT 350.)

25    As a result of the assault, Evans required hospitalization for four to five days. (RT 198.)
26 She suffered bruises on her shoulder and back. (RT 198-199.) The left side of her face was
27 swollen. (RT 199-200.) She also had a cut through her left eyebrow, which required several
28 stitches and left a scar. (RT 199-200.) Evans did not remember how she received the cut, and

4

1  she did not recall seeing a knife. (RT 199.) The cut to her eye resulted in a fracture around the
2  top and bottom. (RT 207.) She suffered pain and abrasions in her neck as a result of the tape.
3  (RT 204.) In addition, her hands and wrists were swollen and she could not bend her fingers for
4  two or three days. (RT 205-206.) After Evans was released from the hospital, she continued to
5  receive treatment for her eye because it would occasionally swell up. (RT 207.) In addition, she
6  is now required to wear eyeglasses because of the injury. (RT 208.) As a result of the assault,
7  she also lost a lot of weight and suffered from depression and insomnia. (RT 249.)

8  Defense Evidence

9       Debra Huston, Petitioner's sister, testified that on the evening of December 30, 2003,
10 Petitioner arrived at her home at approximately 12:00 a.m. (RT 411-413.) Petitioner told Debra
11 that he and Evans got "into it again." (RT 413.) Petitioner stayed for approximately 20 to 25
12 minutes and then left. (RT 415-416.) The police arrived a short time later, after she had went to
13 bed. (RT 416.) She agreed to allow the police to search the house for Petitioner. (RT 417.)
14 Huston denied telling defense investigator, James Farrell, that Petitioner told her that he and
15 Evans got into a fight and he was scared because he hit her and thought he hurt her. (RT 420-
16 423.)

17      Petitioner testified on own his behalf. He indicated that on the evening of December 30,
18 2003, he, Evans, and her two children went to the store between 9:00 and 10:00 that evening.
19 (RT 430.) He indicated that they had a little argument that evening but nothing unusual. (RT
20 431.) When they arrived home from the store, they went to the bedroom and listened to music.
21 (RT 431.) Petitioner stated that around 10:30, they got into an argument regarding Evans' use of
22 rock cocaine. (RT 431.) The two argued until Petitioner left the house shortly after midnight.[3]
23 (RT 432.) Petitioner indicated that Evans was telling him to leave the house and the two
24 continued to exchange verbal assaults. (RT 435.) As Petitioner was putting on his tennis shoes
25 to leave, Evans punched him in the right jaw and he pushed her away causing her to fall and he
26 heard the headboard hit the wall. (RT 435-436.) He then grabbed his backpack and left. (Id.)

27
28    [3] After leaving the house, he walked to his sister's residence which took approximately 30 minutes. (RT 433.) He was there for a while, then left to stay the night at a friend's house.

5

1  He indicated that Evans followed behind him and locked the door.  (RT 435-436.)  He did not
2  pay attention to whether Evans was injured after she fell.  (RT 436.)  He denied seeing any blood.
3  (RT 437.)  He denied using any tape on Evans that evening.  (RT 437, 444.)  After viewing
4  photos of Evans taken after the assault, Petitioner stated he was "pretty sure" he did not leave her
5  in that condition.  (RT 443.)  In response to why Evans may have been untruthful, Petitioner
6  stated that she had "always been that way."  (RT 444.)  After viewing photographs of the
7  bedroom, Petitioner believed that someone must have ransacked the bedroom because the room
8  was not left in that condition.  (RT 444, 445.)

9  Petitioner acknowledged that he had previously been convicted of two robbery
10 convictions, in 1981 and 1987.  (RT 455.)  Petitioner acknowledged that the two argued
11 frequently, however, he denied ever having a physical fight with her, although she had hit him.
12 (RT 517.)

13 Petitioner presented the testimony of two witnesses of which he had a prior intimate
14 relationship and both denied any physical altercations by Petitioner.  (See RT 522-524, 537-538.)

15 Rebuttal Evidence

16 James Farrell, testified that he was a contract investigator for Petitioner's trial attorney.
17 He was assigned the task of interviewing Petitioner's sister, Debra Huston.  (RT 553-554.)
18 During the interview on March 22, 2004, Huston told him that Petitioner arrived at her residence
19 in the early morning hours on December 30, 2003, and was acting scared because he hit Evans
20 and thought he hurt her.  (RT 558.)

21 Marsha Evans testified that she did not smoke cocaine and she was not arguing with
22 Petitioner on the night of December 30th regarding her use of drugs.  (RT 570-571.)

23 <center>DISCUSSION</center>

24 A.     Jurisdiction

25 Relief by way of a petition for writ of habeas corpus extends to a person in custody
26 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws
27 or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,
28 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.   Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.   Ineffective Assistance Of Counsel

Petitioner contends that his trial counsel rendered ineffective assistance by failing to challenge the evidence that the police did not process the crime scene for fingerprints because the victim knew and identified him as the suspect. According to Petitioner, such evidence was an improper opinion on his guilt.

Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S.

8

668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

At trial, Officer Smith testified that she contacted a crime scene technician to respond to the scene in order to take photographs and collect evidence.  On cross-examination, Smith

acknowledged that she did not instruct the evidence technician to process the crime scene or knife for fingerprints. When asked whether the processing of fingerprints was the normal procedure, Smith stated that fingerprints were not taken because he lived at the residence, and she was not aware if fingerprints were collected when the evidence was processed by the technician. (RT 339.)

During rebuttal, the prosecution elicited testimony to clarify that fingerprints are typically taken when the crime involves a suspect that does not reside at the residence, and if there was a positive identification of the suspect, fingerprints were unnecessary. (RT 340, 402.)

In denying Petitioner's claim, the appellate court was not convinced that the testimony constituted improper rebuttal and, in any event, Petitioner's defense was that Evans lied about the attack and his involvement. "He claimed that she may have let someone into the house after he left and that he was set up. In light of this tactic (which was reasonable under the circumstances), it was to his benefit to suggest that the police investigation was not as thorough as it could have been, whether because of negligence, departmental policy, or an assumption (which was never tested forensically) that the victim was telling the truth." (Lodged Doc. No. 1, Opinion, at 16.)

To elaborate on a point indicated by the appellate court, the fact that the police did not forensically test the evidence at the scene, provided Petitioner with the opportunity to present the defense that someone else was the assailant and the victim was not telling the truth. Indeed, had forensic testing been performed and resulted in a positive match, such defense would not have been able. Thus, the appellate courts' finding that the record did not exclude a rationale basis for defense counsel's decision to refrain from imposing an objection, is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent; nor is it based on an unreasonable determination of the facts in light of the evidence presented before the state court. 28 U.S.C. § 2254(d).

///

///

D.      <u>Insufficient Evidence to Support Finding That Petitioner Specifically Intended To Kill</u>

10

<u>The Victim</u>

Petitioner contends that there was insufficient to evidence to support the finding that he specifically intended to kill the victim.

As with Petitioner's prior claim, this claim was presented on direct appeal to the appellate court and California Supreme Court. Because the Supreme Court issued a summary denial of the claim, this Court's looks through to the opinion of the Court of Appeal. <u>Ylst v. Nunnemaker</u>, 501 U.S. at 804-05 & n. 3.

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. <u>Id</u>. at 324, n. 16.

This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. <u>Tinsley v. Borg</u>, 895 F.2d 520, 525 (9th Cir. 1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. <u>Sumner v. Mata</u>, 455 U.S. 539, 597 (1981).

As stated by the state appellate court, "[a]lthough intent to kill is not a necessary element of voluntary manslaughter (*People v. Lasko* (2000) 23 Cal.4th 101, 107), it is a necessary element of attempted voluntary manslaughter (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1545, 1549-1550; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709-710), the offense of which [Petitioner] was convicted in count 1." (Lodged Doc. No. 1, Opinion, at 7.)

An intent to kill may be established by the nature of the wounds and the manner that the wounds were inflicted. <u>Cooper v. Calderon</u>, 355 F.3d 1104, 1110, n.4, n.5 (9th Cir. 2001); <u>see also</u> <u>People v. Chinchilla</u>, 52 Cal.App.4th 683, 690 (1997) (specific intent to kill may be inferred

1  from the circumstances surrounding the shooting).  The jury is free to believe the opposition of
2  an implausible defense theory.  United States v. Stauffer, 922 F.2d 508, 515 (9th Cir. 1990).
3        The state appellate court properly found that there was sufficient evidence to support the
4  jury's finding that Petitioner harbored the necessary specific intent to kill the victim.  In this
5  instance, the intent to kill is established by Petitioner's actions during the assault on the night in
6  question.  Indeed, the victim's recount of the assault, as corroborated by her son's testimony,
7  show a specific intent to kill.  More specifically, Petitioner awake Evans from her sleep and for
8  no apparent reason jumped on top of her and placed tap on her mouth.  After she removed the
9  tape, Petitioner proceeded to put more tape over her mouth again and taped her hands together.
10 He threatened that if she screamed for help he would hurt her and the children even more.
11 Petitioner then struck her twice in the head with a closed fist, causing her to lose consciousness
12 and suffer a substantial cut above her left eye.  As if that was not enough, he then placed tape
13 around her neck so tightly that she was grasping for air and the responding officer had a hard
14 time getting it loose to cut it off.  Petitioner's actions clearly evince his specific intent to kill
15 Evans on the night in question.  Thus, it was certainly reasonable for the jury to reject
16 Petitioner's theory that the victim was fabricating the assault and someone else must have done
17 it, and find instead that Petitioner harbored a specific intent to kill the victim.  It is not the
18 province of this Court to second-guess the jury's finding or to reweigh the evidence.
19 Accordingly, the evidence viewed in the light most favorable to the prosecution, supports the
20 appellate court's finding that there was sufficient evidence to support the finding that Petitioner
21 harbored a specific intent to kill.
22 E.    Instructional Error
23        Petitioner contends that the instructions given to the jury were confusing because the
24 specific intent to kill element was omitted.
25        Petitioner raised this claim on direct appeal to the state appellate court and California
26 Supreme Court.  As with Petitioner's prior two claims, this Court's looks to the last reasoned
27 state court opinion of the Court of Appeal.  Ylst v. Nunnemaker, 501 U.S. at 804-05 & n. 3.
28        A challenge to a jury instruction solely as an error under state law does not state a claim

cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). In reviewing an ambiguous instruction, the inquiry is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Id. at 72, *quoting* Boyde v. California, 494 U.S. 370, 380 (1990). A jury instruction violates the Constitution if its use "so infused the trial with unfairness as to deny due process of law." Lisenba v. California, 314 U.S. 219, 228 (1941). The instruction "must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 67, *citing* Cupp v. Naughton, 414 U.S. 141, 147 (1973). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id.  The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982) (*citing* Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).  Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Id.

Although acknowledging that the jury instructions could have been framed in better terms of explaining attempted crimes, the state appellate court nonetheless found any error harmless. The court explained that "[t]he instructions informed jurors that voluntary manslaughter required an intent to kill, and that attempted voluntary manslaughter required an intent to commit voluntary manslaughter.  Moreover, [the instructions] explained the distinction that exists between malice and intent to kill where the killing occurs as the result of a sudden quarrel or heat

of passion." (Lodged Doc. No. 1, Opinion, at 10-11.)  The court went on to state that even if it is assumed that the instructions were potentially confusing or ambiguous there was not a reasonable likelihood that the jury misunderstood and misapplied the instruction.  (Id.,Opinion, at 11-12.)

Under California law, the trial court must instruct, sua sponte, on a lesser included offense when there is substantial evidence to support "the defendant is guilty only of the lesser offense. . . ."  People v. Breverman, 19 Cal.4th 142, 145 (1998).

In Count One of the Second Amended Information, Petitioner was charged with attempted murder.  (CT 111-112.)  As to this charge, the jury was instructed that:

> Murder is the unlawful killing of a human being with malice aforethought.
>
> In order to prove attempted murder, each of the following elements must be proved: One, a direct but ineffectual act was done by one person towards killing another human being; and two, the person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being.

(RT 589.)

In the alternative, the jury was instructed on the lesser included charge of attempted voluntary manslaughter, of which Petitioner was found guilty.  Specifically, the jury was instructed that:

> The crime of manslaughter is the unlawful killing of a human being without malice forethought.
> Every person who unlawfully kills another human being without malice aforethought but with an intent to kill - - ladies and gentlemen, some of these haven't been completely modified - - but with an intent to kill is guilty of voluntary manslaughter section 192 subdivision (a).
> There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion.
> In order to prove this crime each of the following elements must be proved: A human being was killed; the killing was unlawful; and the perpetrator of the killing intended to kill the alleged victim, and the perpetrator's conduct resulted in the unlawful killing.

(RT 596.)

As this case involved not the complete crime but an attempt to complete the crime, the trial court explained, "An attempt to commit a crime consists of two elements, namely a specific intent to commit the crime and a direct but ineffectual act done towards its commission."  (RT 597.)  The court further elaborated on the lesser offense of attempted voluntary manslaughter

14

stating:

> The distinction between attempted murder and attempted voluntary manslaughter is that attempted murder required malice when attempted manslaughter does not. [¶] When the attempted killing, though unlawful, in the heat of passion or excited by a sudden quarrel that amounts to adequate provocation, the offense is attempted voluntary manslaughter. In that case, even if an intent to kill exists, that law that malice [sic], which is an essential element of attempted murder, is absent.

(RT 599-600.)

As explained by the state appellate court, the instructions clearly conveyed that voluntary manslaughter required an intent to kill the victim and that attempted voluntary manslaughter required a specific intent to commit voluntary manslaughter. (See RT 596-597.) After defining attempted murder and attempted voluntary manslaughter, the trial court gave the jury CALJIC No. 3.31, which instructed the jury that the crime of attempted murder and the lesser included offense of attempted voluntary manslaughter, "there must exist a union of joint operation of act of conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists the crime or allegation to which it relates is not committed or is not true." (RT 603-604; CT 273.) The court explained the difference between malice aforethought and the intent to kill as a result of a heat of passion or a sudden quarrel.

Moreover, closing argument by counsel further clarified the state of the law regarding the intent requirement. Specifically, the prosecutor explained,

> the only difference between [attempted murder] and the crime of attempted voluntary manslaughter is that voluntary manslaughter still requires an intent to kill but it's basically excused or justified or mitigated attempted murder in the sense that it occurs because of heat of passion or sudden quarrel.

(RT 676.) In addition, defense counsel emphasized that,

> Attempted murder and attempted voluntary manslaughter both require something called a specific intent to kill . . . . If [Petitioner] did not intend to kill, that's for you to decide. Then you can't find him guilty of attempted murder or attempted voluntary manslaughter.

(RT 714.)

Although as recognized by the appellate court, the instructions may have been less than ideal in terms of explaining the concept of attempted crimes, a review of the entire record does not support a finding of constitutional error. The instructions viewed as a whole explained the

requirement that a specific intent to kill the victim was a necessary element of attempted voluntary manslaughter. Simply stated, the jury was instructed that Petitioner was charged in Count One with attempted murder which required a specific intent to kill; however, if the jury was not satisfied that he was guilty of that crime, it could convict of attempted voluntary manslaughter (the lesser included offense), if no malice aforethought was present. Having been so instructed, the jury's convicted on the lesser included offense of attempted voluntary manslaughter necessarily finding the specific intent to kill but no malice aforethought. Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

F.  Motion for Discovery

On July 7, 2008, in a separate motion, Petitioner filed a request for leave to conduct discovery pursuant to Rule 6, Governing Section 28 U.S.C. § 2254. (Court Doc. 32.) Respondent filed an opposition on July 24, 2008, and Petitioner filed a reply on October 1, 2008. (Court Docs. 34, 37.)

Petitioner requests certain unspecified documents from the custodian of records, an affidavit of a recanting witness, production of certain 911 tape recordings, and a copy of any and all police and radio telephone communication concerning the case, which he claims is in the possession of the Fresno Police Department. (Motion, at 1-2.) Petitioner contends that the District Attorney told Marsha Evans and her son if they did not testify they would be placed in jail and juvenile hall. (Motion, at 4.) Petitioner also seeks any information relating to information regarding racial prejudice, dishonesty, false arrest, illegal search and seizure, fabrication of charges regarding eleven named officers. (Motion, at 2-3.) Petitioner also seeks the written procedure for processing and investigation citizen complaints against personnel of the Fresno Police Department. Petitioner claims that the case involves issues of perjured testimony, fabrication of charges, racial bias, and dishonesty on the part of the police officers involved. (Motion, at 5.)

Although discovery is available pursuant to Rule 6, it is only granted at the Court's discretion, and upon a showing of good cause. Bracy v. Gramley, 520 U.S. 899, 904 (1997);

1  McDaniel v. United States Dist. Court (Jones), 127 F.3d 886, 888 (9th Cir. 1997); Jones v. Wood,
2  114 F.3d 1002, 1009 (9th Cir. 1997); Rule 6(a) of the Rules Governing Section 2254.  Good cause
3  is shown "where specific allegations before the court show reason to believe that the petitioner
4  may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."
5  Bracy v. Gramley, 520 U.S. at 908-09 (citing Harris v. Nelson, 394 U.S. 287 (1969).  Discovery
6  will not be allowed so that the petition can "explore [his] case in search of its existence," looking
7  for new constitutional claims.  See Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999).  If
8  good cause is shown, the extent and scope of discovery is within the court's discretion.  See
9  Habeas Rule 6(a).  The Court's duty in a habeas proceeding is to determine whether or not
10 petitioner's constitutional rights were violated in the course of the conviction.

11         As Respondent points out, the instant habeas petition is proceeding only on the three
12 claims addressed herein. (Petition, at 5, 6, 8.)  Respondent opposes Petitioner's discovery
13 requests based on the lack of connection between the requested materials and the operative
14 claims of this action is proceeding.  Respondent's argument is persuasive.  Although Petitioner
15 contends that the discovery materials are relevant to this case, he does not elaborate or
16 demonstrate how the material is relevant to the disposition of the three constitutional claims
17 raised in this action.   Petitioner's request for discovery is based on purely speculative and
18 conclusory allegations.  Indeed, after a review of the record in this case, the Court finds that the
19 information sought is not relevant to the claims in the instant petition.  The Court has before it
20 sufficient evidence and information to make a determination on the merits of Petitioner's claims.
21 Further discovery would be unnecessary and redundant, and would cause undue delay.  In
22 addition, there is no indication that Petitioner sought to develop these purported factual
23 circumstances in the state court and any attempt to add any of these claims in the instant action
24 would be sought to dismissal as unexhausted. Accordingly, because Petitioner has failed to
25 demonstrate good cause, his request for discovery should be DENIED.
26 ///
27 ///
28                                          RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED;

2. Petitioner's motion for discovery be DENIED; and,

3. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   October 21, 2008                     /s/ Dennis L. Beck
                                        UNITED STATES MAGISTRATE JUDGE